

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–16–784

| | | |
|---|---|---|
| | | **Opinion Delivered** March 29, 2017 |
| TIMOTHY SMITH | | APPEAL FROM THE SALINE |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. 63DR-15-861] |
| V. | | |
| | | HONORABLE STEPHANIE |
| MICHELLE MURPHY | | CASADY, DISTRICT JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## BRANDON J. HARRISON, Judge

The issue here is whether one instance of corporal punishment of a four-year-old child with a leather belt, that spanned from the child's upper-back to his knees and caused some bruising and mental anxiety, was sufficient evidence to support the entry of an order of protection against the child's father, for five years. We hold that it was and affirm.

### I. *Background*

The case started when Michelle Murphy filed a verified petition in the Saline County Circuit Court alleging that Timothy Smith had injured one of their children, S.S., while S.S. was visiting Smith in Texas. In the petition Murphy stated that Smith "had a very abusive past" and that he had been charged in Texas in 2008 for child endangerment and domestic violence. Murphy further alleged that when she picked up the three children from Smith after his summer visitation, S.S. "had bruises half way up his back across his buttocks

and down his right leg, from a belt." Murphy stated that S.S. had been admitted to Pinnacle Pointe Hospital "because of the mental and physical abuse his father put him through" and because S.S. "threatened to kill himself, because he didn't want to be part of a family anymore, because all families do is hurt each other." Murphy asked the court to prohibit Smith from contacting her and the children and to award temporary custody or establish temporary visitation rights. An ex parte order of protection was filed the same day as the petition, on 10 August 2015. The order awarded custody of the children to Murphy.

A "Final Order of Protection" was entered on 16 November 2015 following a hearing that same day. The order states that it is effective until 16 November 2018 and prohibits Smith from having visitation with the children "unless and until modified by the judge on the divorce." It was signed by a district court judge. Smith filed a timely motion for a new trial on 30 November 2015, alleging that the recording device present during the hearing was not fully operational and that the court erred in granting a protective order because "child abuse does not include physical discipline of a child when it is reasonable and moderate and is inflicted by a parent or guardian for purposes of restraining or correcting a child." The district court granted the motion for new trial, and a second trial was held on 24 May 2016.

Smith appeals the final order of protection that was entered on 25 May 2016. His notice of appeal states that the "Order was entered by the District Court pursuant to Administrative Order 18(b)(2) and is therefore a final order of the Circuit Court. . . . Appellant takes this Appeal to the Arkansas Court of Appeals."

II. *Jurisdiction*

An appellate court must raise jurisdictional issues even when the parties do not. *See*

*Barclay v. Farm Credit Servs.*, 340 Ark. 65, 8 S.W.3d 517 (2000). In this case, a district judge

signed the order of protection; the order was then filed with the circuit court clerk. District

courts' subject-matter jurisdiction is established by supreme court rule. Ark. Const. amend.

80, § 7(B); Ark. Code Ann. § 16-17-704 (Repl. 2010). Arkansas Administrative Order

Number 18(6)(b) provides that a state district court judge may be referred matters pending

in the circuit court: "A state district court judge presiding over any referred matter shall be

subject at all times to the superintending control of the administrative judge of the judicial

circuit." Ark. Sup. Ct. Admin. Order No. 18(6)(b). Referred matters can include any case

in the civil, probate, or domestic relations division in which the parties have agreed in

writing to proceed in the district court, "protective orders," forcible entry and detainers and

unlawful detainers, and other matters. Ark. Sup. Ct. Admin. Order No. 18(6)(b)(1)−(4). If

there is an appeal, the court reporter assigned to the circuit judge who referred the case to

the state district court is charged with transcribing the audio tape and certifying the

transcript. Ark. Sup. Ct. Admin. Order No. 4(e)(1)−(2).

Administrative Order No. 18(6)(c) states that

> [e]xcept for the exercise of consent jurisdiction which is governed by
> subsection (d), with the concurrence of a majority of the circuit judges of a
> judicial circuit, the administrative judge of a judicial circuit may refer matters
> pending in the circuit court to a state district court judge, with the judge's
> consent, which shall not be unreasonably withheld. A final judgment
> although ordered by a state district court judge, is deemed a final judgment of
> the circuit court and will be entered by the circuit clerk under Rule 58 of the
> Arkansas Rules of Civil Procedure. Any appeal shall be taken to the Arkansas

SLIP OPINION

Supreme Court or Court of Appeals in the same manner as an appeal from any other judgment of the circuit court. An order that does not constitute a final appealable order may be modified or vacated by the circuit judge to whom the case has been assigned as permitted by Rule 60 of the Arkansas Rules of Civil Procedure.

There is no evidence in this record that the parties consented to the district court's jurisdiction; nor is there evidence of a referral from the circuit court to the district court. But there is no objection to the fact that a district-court judge decided the case, and the 22nd Judicial District of Arkansas Administration Case Allocation plan provides that the Saline County District Courts shall have all authority permitted under the Arkansas Supreme Court's Administrative Rule No. 18 and that the Bryant division shall hear all final orders of protection cases. District Judge Casady is the only judge in the Bryant division. So pursuant to Administrative Order No. 18(6)(c), the final order of protection may be appealed directly to our court as could be done from circuit court, and the appeal procedures embodied in Arkansas District Court Rule 9 do not apply.

A final order of protection entered in circuit court pursuant to section 9-15-205 is appealable under Ark. R. App. P.–Civ. 2(a)(1). *See Steele v. Lyon*, 2015 Ark. App. 251, 460 S.W.3d 827; *Hancock v. Hancock*, 2013 Ark. App. 79. Smith filed a timely notice of appeal to this court from the final order of protection. We therefore conclude that we have jurisdiction to decide his appeal.

### III. *Sufficiency of the Evidence*

Because Smith essentially raises a sufficiency-of-the-evidence point, we will provide a more detailed factual background before addressing his argument. During the May 2016 trial, licensed counselor Sunnie Butcher Keller testified that Smith's child, S.S., was referred

to her care from the Sheridan School District around the last week of August 2015. Sunnie was also a counselor for E.S., S.S.'s older sister. In the fall of 2015, Sunnie transcribed E.S.'s version of the leather-belt incident. The transcript was admitted as Petitioner's Exhibit 2.

According to E.S. the incident happened in July. She recalled eating breakfast and then going outside to play. S.S. wanted to play on his tablet in the kitchen, but Dad would not let him. E.S. said that S.S. became upset and kept asking Dad, who threw the tablet to the ground and it shattered. Dad walked away to his bedroom, and E.S. gave crying S.S. a hug and told him everything was fine. Dad returned to the living room and began to play a video game that S.S. wanted to also play. S.S. kept asking to play and Dad became "aggravated," dropped the video-game controller, and went back to his bedroom, slamming the door. S.S. was upset and crying and E.S. gave him another hug. E.S. asked Dad if they could play outside and he said "Yes but stay out of trouble." E.S. said that the spanking occurred in the living room with a plain leather belt, that S.S. was crying, that Dad hit him "a bunch," that Dad screamed "Go to your room," and that she saw bruises on S.S.'s back.

E.S. also testified during the trial that she wrote the document that Sunnie had typed. She said that Dad had spanked S.S. with a black leather belt and that S.S. cried "for like an hour." According to E.S., Dad gets mad "often" when she and her brothers are with him. She said that she misses her dad but she is scared that "he'll do that to me, [my brother], or [S.S.] again." When asked on cross-examination if Dad said, "I promise to not use spankings at all, I promise not to hit children at all; would you then—would you want to go back and see him again?" She said yes.

S.S. testified that he was five, almost six, years old. He said that he remembered a spanking that happened, he didn't want to talk about it, and he denied that it was scary. On cross-examination, he responded "Uh-huh" when asked if he would like to see his dad again.

When examined by the court, S.S. acknowledged that he remembered the spanking, that he received it because he "got in trouble," but that he didn't remember what he got in trouble for. S.S. said that his dad caused bruises on his "hiney" and his leg.

Sunnie, the counselor, testified that she had no reason to believe that either S.S. or E.S. had been coached or told to say something. She explained that S.S. had been diagnosed with post traumatic stress disorder after his behavior was becoming "unmanageable across all settings." S.S.'s symptoms included hypervigilance and trouble sleeping. Sunnie said that S.S. throws tantrums when his mother leaves and has to be "literally physically taken out of a vehicle." When questioned by the court, Sunnie said that she felt that "not being around Dad has been beneficial" and that because of his age and lack of insight S.S. had not been able to process his feelings about the incident. She explained to the court that E.S. and S.S. have had a difficult time with two types of emotions they have for their father: feelings of anxiousness/not wanting to get hurt again and feeling that they both really want to see their dad.

On cross-examination, Sunnie acknowledged that the children have expressed a willingness to see their father. When asked if the children would be able to visit their father if he was "willing to commit to just simply not use corporal punishment," Sunnie responded that if Smith were closer in proximity and "mom was readily available to [S.S.] at any time

. . . that might be a possibility." She further explained that S.S.'s attachment to his mother "is definitely one you would have to—you would have to see in a setting . . . the physical aggression to slapping her, cussing her out . . . but yet he wants mom . . . that is what you call an insecure attachment."

She further acknowledged that there were periods of time when S.S. got better and suddenly worse and that he had no contact with his father "at the time he got worse." Sunnie also testified that she never talked to Smith because "it wasn't on the consents to do so." She acknowledged that, per his mother, S.S. had behaviors like opposition, defiance, and arguing "to a certain degree" before the incident. But that after the incident S.S. reportedly "wanted to die," which is why he was referred to Sunnie for outpatient therapy after his discharge from acute inpatient treatment in August 2015.

Cody Evans, a friend of Murphy's, said that she went with Murphy to pick up the kids from Smith at a halfway point in Texas. Evans did not recall the date. They stayed with the children in a hotel and when S.S. began to change into his pajamas, Evans noticed red marks on his back and "bruises on his back, down his legs, and all the way to his ankles." She took pictures of S.S.'s back and described the bruises as ones "in the shapes of belt marks." The photos were collectively admitted as Exhibit 1.

Murphy testified that the visitation schedule with Smith was one weekend a month, every spring break, alternating holidays, and a six-or-seven week visitation period during the summer. She also said that she and Smith had discussed trying to get S.S. to therapy for his hyperactivity before the incident occurred. After Murphy saw the bruises on S.S. in the hotel room, she called a child-abuse hotline, filed a police report, and took S.S. to a hospital.

In August 2015, S.S. told Murphy that he wanted to kill himself, which was about a week and a half after he had returned from his father's, stating that if "he wasn't here, then we wouldn't be arguing over him." S.S. was referred to and received acute mental–health inpatient treatment.

On cross-examination, Murphy stated that Texas child-protective services investigated Smith. Exhibit 3 is a letter from the Texas agency stating that "a preponderance of the evidence supports that the alleged abuse or neglect did occur." It lists Smith as the perpetrator, S.S. as the victim, and physical abuse as the finding. Murphy also said that there was a prior incident in Corpus Christi involving E.S. and that Smith had been ordered to take anger–management classes.

Smith testified on his behalf and said that he had spanked his children "less than three times in their entire life." According to Smith, S.S. went inside the neighbor's house without permission after Smith had told him specifically not to go there. When S.S. returned, Smith said that S.S. stated that "he was fixing to go back home to his mom's house, and that there was nothing I could do about it," and then S.S. punched Smith's face. Smith then said he gave S.S. three swats with a belt. Smith testified that while Texas child support services did not "recommend against using corporal punishment" he had made a decision that using corporal punishment "seems like it's more trouble than it's worth." He also said, "I'll never spank my kids again. I never liked spanking in the first place. That was her punishment. Her type of punishment was spanking." He also said that Murphy had accused him of raping E.S., but no one ever followed up on that accusation. Smith thought

that E.S.'s story about the spanking was inaccurate because his girlfriend was not present and she "usually came over in the evenings."

On cross-examination, Smith testified that he is five feet eleven and weighs 210 pounds and that S.S. weighs about 40 to 55 pounds. He also said that Murphy's testimony that he was ordered to take anger-management classes was a "bold face lie" and that the spanking occurred "earlier that week sometime"; he did not say which day it occurred or how many days before the children were driven to the halfway point for pick up.

As we said earlier, the court entered a final order of protection on 25 May 2016. The order states, in part, that

1. The burden of proof has been met.

2. The testimony regarding how [S.S] obtained the bruising is consistent and it is not disputed. The father caused [S.S.'s] physical injuries. As a result of that physical harm, there has been harm to all three children.

3. The "spanking" was not reasonable. It was NOT moderate. It is not appropriate discipline. The Court resents that the term "spanking" is used to describe what happened in this case. Corporal punishment is allowed by Arkansas law. If this were reasonable and moderate, the order of protection would not be necessary to prevent future harm.

4. The Court heard testimony of several witnesses and assessed the credibility of each person. Various weight was given to each based on how truthful they were found to be.

5. The therapist was genuine and unbiased. She is concerned with the children and what is in their best interest. She testified that [S.S.] has a PTSD diagnosis and that he can't begin specific treatment for that diagnosis until he is six years old.

6. The mother was a credible witness. She did all that she could when she discovered the bruises. She contacted Lufkin Police, she contacted CPS in Corpus Christi, she took [S.S.] to Arkansas Children's Hospital, photographed the bruises, and got [S.S.] in therapy.

7. Specifically, the Court considered the fact that the father does not believe his actions were wrong. He did not indicate any remorse through his words or how he conducted himself in the courtroom. The Court watched him throughout the entire hearing, his demeanor was completely inappropriate. He smirked throughout the hearing. He did not display proper emotion as the witnesses testified about things that were very serious and painful for his children.

8. [E.S.] and [S.S.] were asked if they wanted to see their father. Of course they do. Children who suffer way more serious abuse still want to see their abuser. That is not uncommon. It is not their decision. The Court must decide for them. In this case, there was no testimony to allow the Court to believe the father won't do this again. He has not participated in any services. He doesn't even think he did anything wrong.

9. The order of protection will expire on May 24, 2021 unless a court of competent jurisdiction finds otherwise.

## IV.  *Analysis*

At the hearing on a petition filed under the Domestic Abuse Act, upon a finding of domestic abuse, the circuit court may provide relief to the petitioner. Ark. Code Ann. § 9–15–205(a) (Repl. 2015). "Domestic abuse" is defined as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members." Ark. Code Ann. § 9–15–103(3)(A). Our standard of review is whether the court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Bohannon v. Robinson*, 2014 Ark. 458, at 5, 447 S.W.3d 585, 588. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Id.*

SLIP OPINION

Smith's essential argument is that a single incident of spanking with a belt is not sufficient to justify the order of protection; he believes the court's order is a "severe deprivation of parental rights."[1] And he cites several cases for the proposition that "corporal punishment by a parent is not per se child abuse under Arkansas law" and "the existence of bruising after a spanking is not adequate to establish excessive corporal punishment."

We are not moved. None of the cases Smith cites were decided under the statutory definition of domestic abuse contained in Ark. Code Ann. § 9-15-103(3)(A), which is part of the Domestic Abuse Act and is the law that governs the issuance of protective orders. Smith instead relies on cases that addressed corporal punishment within the context of the criminal law and the juvenile code. *See, e.g.*, *Johnson v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 244, at 7, 413 S.W.3d 549, 553 (child not dependent–neglected when spanking caused only transient pain); *Brown v. Brown*, 76 Ark. App. 494, 503, 68 S.W.3d 316, 322 (2002) (corporal punishment by a parent was not necessarily child abuse); *Sykes v. State*, 57 Ark. App. 5, 940 S.W.2d 888 (1997) (holding that grandmother did not commit second-degree battery by spanking 11-year-old grandson with telephone cord when there was no evidence of bruising or bleeding); *see also* Ark. Code Ann. § 9-27-303(3)(A) (defining "abuse" under the juvenile code and excluding "[p]hysical discipline of a child when it is reasonable and moderate and is inflicted by a parent or guardian for purposes of restraining

---

[1]Murphy says that Smith's arguments are not preserved. She is mistaken. The district court made findings that specifically addressed Smith's corporal-punishment argument; and he could have challenged the sufficiency of the evidence for the first time on appeal following a bench trial. *Bohannon v. Robinson*, 2014 Ark. 458, at 5, 447 S.W.3d 585, 588 (A party who does not challenge the sufficiency of the evidence during a final hearing on a protective order does not waive the right to do so on appeal.).

or correcting the child"); Ark. Code Ann. § 5-1-102(14) (defining physical injury); Ark. Code Ann. § 5-2-605(1) (defining justifiable physical force).

These cases inform, but do not control, our decision today because we must apply the statutory definition of "domestic abuse" under section 9–15–103(3)(A). "The remedies available under the Domestic Abuse Act are unknown to the common law and are completely governed by statute." *Wills v. Lacefield*, 2011 Ark. 262, at 5 *overruled on other grounds by Bohannon v. Robinson*, 2014 Ark. 458, 447 S.W.3d 585. Also, the "statute does not mean that a petitioner who alleges domestic abuse or the threat of domestic abuse is precluded from seeking an order of protection if he or she could also seek other remedies, such as criminal charges or civil damages." *Steele v. Lyon*, 2015 Ark. App. 251, at 3, 460 S.W.3d 827, 830; *Contra* Mark M. Killenbeck, *And Then They Did … ? Abusing Equity in the Name of Justice*, 44 Ark. L. Rev. 235 (1991).

Not many cases have determined the scope of the term "domestic abuse" as it is defined in section 9–15–103(3)(A); fewer still have addressed the corporal–punishment context. But here are examples where domestic abuse has been found:

- When a boyfriend grabbed a girlfriend, screamed obscenities in her face, and burst a beer bottle behind her at a party, causing her to fear for her safety. *Pablo v. Crowder*, 95 Ark. App. 268, 236 S.W.3d 559 (2006).

- Threats to beat up a girlfriend four months before the petition was filed can constitute domestic abuse under the statute. *Simmons v. Dixon*, 96 Ark. App. 260, 240 S.W.3d 608 (2006).

- A girlfriend hitting a boyfriend and then sending text messages threatening that she would kill herself in front of him, among other things. *Steele v. Lyon*, 2015 Ark. App. 251, 460 S.W.3d 827.

- Gunshots fired outside house by a spouse. *Davenport v. Burnley*, 2010 Ark. App. 385.

Events that have not met the definition of domestic abuse are:

- Teenage boyfriend procuring morning after pill for teenage girlfriend. *Claver v. Wilbur*, 102 Ark. App. 53, 280 S.W.3d 570 (2008).

- A car accident. *Bohannon v. Robinson*, 2014 Ark. 458, 447 S.W.3d 585.

- Some bruising on a neighbor that "was not inconsistent with fingerprints." *Newton v. Tidd*, 94 Ark. App. 368, 369, 231 S.W.3d 84, 85 (2006).

- Husband pulling phone out of wall and closing living-room blinds. *Oates v. Oates*, 2010 Ark. App. 345, 377 S.W.3d 394.

Recall that the definition of domestic abuse is "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members." Ark. Code Ann. § 9-15-103(3)(A). Given the statutory definition and the facts of this case, we hold that the court's finding of domestic abuse is not clearly erroneous or clearly against the preponderance of the evidence. A four-year-old child incurred a bodily injury when his father struck him up and down with a leather belt, leaving bruises. (Color photographs of the child's bruised body were introduced as evidence.) The child's therapist testified about how traumatic the experience was for S.S. and that is why the child said he wanted to kill himself and needed inpatient mental-health treatment. E.S. testified that she feared her father would do the same thing again, and Murphy expressed the same fear. There were true findings against Smith by child-protective services in Texas. The court did not find Smith to be a credible or remorseful witness. The court credited Murphy and weighed the therapist's testimony heavily in favor of issuing the protection order. We defer to the court's assessment of the witnesses' credibility and its determination

that the way Smith struck S.S. with a belt was not a reasonable or moderate discipline technique and affirm on this point.

After finding domestic abuse, the court may grant relief for a fixed period of time not less than ninety days, nor more than ten years, subject to renewal at a subsequent hearing upon finding that the threat of domestic abuse still exists. Ark. Code Ann. § 9-15-205(b). One of the options available to a person seeking a protective order is to award him or her temporary custody of minor children; temporary visitation rights may also be established. Ark. Code Ann. § 9-15-205(a).

Here, the district-court judge found that Smith should have no visitation with his children for five years (until 24 May 2021). In his appellate brief Smith makes a passing, one-sentence argument on this point: "The duration of the order is far out of proportion for the alleged conduct here." But he does not develop the point or cite any authority for reversal. So we will not address the order's duration. *See Baptist Health v. Murphy*, 2010 Ark. 358, at 30, 373 S.W.3d 269, 289 (appellate court need not address arguments that are not sufficiently developed and lack citation to authority). We are, however, impelled to state that the court's visitation determination is a temporary determination under the Domestic Abuse Act and may stand until the court with original jurisdiction enters a subsequent order regarding the children under the Uniform Child-Custody Jurisdiction and Enforcement Act. Ark. Code Ann. § 9-15-205(3); Ark. Code Ann. § 9-15-215; Ark. Code Ann. § 9-19-204. Orders of protection are also subject to modification under Ark. Code Ann. § 9-15-209.

The entry of the final order of protection against Smith is affirmed.



Affirmed.

GLADWIN and MURPHY, JJ., agree.

*Baker Schulze Murphy & Patterson*, by: *J.G. "Gerry" Schulze*, for appellant.

*Kristin Riggan*, for appellee.