Cite as 2025 Ark. App. 227

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-23-769

| | |
|---|---|
| LEE ANN HALL<br><br>APPELLANT<br><br>V.<br><br>SCARLETT SIMS<br><br>APPELLEE | **Opinion Delivered** April 16, 2025<br><br>APPEAL FROM THE LAWRENCE COUNTY CIRCUIT COURT<br>[NO. 38DR-23-82]<br><br>HONORABLE MICHELLE C. HUFF, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Lee Ann Hall appeals from a final order of protection the Lawrence County Circuit Court entered 18 August 2023 preventing her from harassing, abusing, or initiating contact with her daughter-in-law Scarlett Sims, or Scarlett's four minor children. Scarlett's husband Mathew filed a similar petition some six weeks later. The circuit court granted both petitions after consolidating them for hearing in August 2023. Lee Ann argues the circuit court clearly erred in finding she committed domestic abuse, which Ark. Code Ann. § 9-15-103(4) (Repl. 2020) defines as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members." With a finding of domestic abuse, the circuit court can provide relief including orders to exclude the abusing party from a victim's residence and workplace and restrain him or her from further contact, harassment, or mistreatment. Ark. Code Ann. § 9-15-205(a)(1), (2), (6) & (8) (Repl. 2020). The court entered a final order of protection granting

that relief to Scarlett and the minor grandchildren for ten years. It granted Mathew the same relief for the same time. Lee Ann appeals both orders. Today we affirm the circuit court's order in this appeal, and in the related appeal, *Hall v. Sims*, 2025 Ark. App. 228.

Lee Ann is Mathew's mother, and Mathew is Scarlett's husband. That much is clear. When events began, the Sims family was living in Walnut Ridge with Elizabeth Novacinski, whom everyone calls "Granny." Mathew testified that she is his grandmother. Lee Ann testified that Granny is her mother. Scarlett testified that Granny is Mathew's grandmother but not Lee Ann's mother. Lee Ann was "saying that it's her mom," she continued, "but she's not kin to her at all." The circuit court was confused. Counsel agreed, "It's very confusing." Scarlett was right. Lee Ann explained, "She's been my mother since I was 15 . . . . It's my ex husband's mom."

In any event, Lee Ann had worked as a traveling nurse. She began spending more time with Scarlett's four children,[1] who were boys aged eight and younger, after retiring in late 2022 at the age of forty-eight. In May 2023, the Simses' objections to her behavior boiled over. Scarlett testified that Lee Ann was sleeping naked with the boys. Lee Ann would let them go into Walmart by themselves to pick out toys and would beat them with a belt over Scarlett's objection. When Scarlett raised these concerns, Lee Ann responded that she "can do whatever she wants in her house." Hubris never ends well.

The afternoon of May 16, after a school graduation, Lee Ann showed up at the Simses' home to pick up the children. Scarlett would not let her. When Scarlett told Lee

---

[1]Lee Ann testified that Scarlett has children by two of her sons, and the two oldest children are Scarlett's by Mathew's older brother.

2

Ann she was not allowed to be around the children, Scarlett said that Lee Ann "told me that if I don't let her see my kids, she will make sure I'd never see them again." Scarlett testified that Lee Ann told her "me and my husband would be in the ground before we stopped her." Lee Ann was waving her finger and her voice was raised. She threatened that she would evict the Sims from their house, and Mathew wouldn't have a job anymore. As the circuit court would eventually find, Lee Ann made good on both those threats.

The police were called; they asked Lee Ann to leave. Scarlett petitioned for an order of protection in this action May 24. The court set a hearing for July but continued it to August 14 for consolidation with Mathew's similar petition of June 29.

The testimony covered events between May and June, including investigations and proceedings in other courts that are described, but not otherwise documented, in this record. After Lee Ann was served with Scarlett's Lawrence County petition in this action for an order of protection over the May 16 incident, Lee Ann petitioned for an ex parte order of protection against Mathew (her son, remember) in Greene County. The Greene County court entered a temporary order of protection but dissolved and dismissed it later after a hearing. Lee Ann then removed Granny from the Walnut Ridge house and, according to Scarlett, used a power of attorney to file terroristic-threatening charges against Scarlett and Mathew on Granny's behalf. Those charges were also dismissed. But someone (whether Granny herself or Lee Ann is unclear) obtained an ex parte order of protection for Granny against Mathew. And police told Mathew to leave the Walnut Ridge house because Lee Ann would be bringing Granny back to it.

On June 28, he went back to the house to get his belongings. Scarlett testified that, around 3:00 p.m., she and Mathew were sitting on the porch when Lee Ann pulled up in her SUV. When Mathew asked what she was doing there, Lee Ann said, "I have something that will end you," and opened the car door. She had a revolver in a holster in the side door. She grabbed it and flashed it at them. Scarlett was scared to death. Mathew recognized the revolver as his stepdad's.[2] Lee Ann has "bragged about flipping it to people driving down the road," he said. The Simses left to file a police report.

While they were gone, their neighbor Christy Duke drove by the house around 6:45 p.m. on her way to a Wednesday church service. She saw Granny outside the house, standing near a gray SUV she didn't recognize with a maroon truck backed up beneath the drive. A woman she didn't know then, but identified as Lee Ann later, was on the porch unlocking the door. Duke stopped to ask Granny if everything was all right but had to cut the conversation short to get to church. On the drive back, both vehicles were still outside Granny's house, and Lee Ann was opening the gate to the back yard. Duke messaged Scarlett, who identified Lee Ann and her husband from a photo. Around 9:30 p.m., the Halls were inside the house, Duke said.

The next morning, Duke called police because "the front door was wide open." They called her over to give a statement. Duke had been in the house before because her grandson plays with Scarlett's kids. She said that none of Granny's belongings were

---

[2]Lee Ann identified the gun he described as "his dad's gun." Counsel clarified, "[W]hen you say 'his dad,' you mean your husband [Mathew's stepfather], correct?" She said yes. The stepfather goes by George. His name is Billy; he got "George" from his sister.

4

bothered, but there were toys dumped on the floor, everything was pulled out of the closets, and the beds had been disassembled. In the backyard, she could see that a bedframe and a mess of clothes had been piled up and burned. Police advised Scarlett and Mathew "to go ahead and get their stuff out since things were escalating" as they were. Mathew petitioned for an order of protection the same day. The Sims moved in with Steve Warren, Scarlett's mother's fiancé, who worked construction with Mathew.

A few weeks later, Duke was at home when Lee Ann began knocking insistently at the front door. Duke wasn't going to answer, but her young grandson was home, and she saw Lee Ann motion for him to open the door. Lee Ann introduced herself as Mathew's mother. Duke said she didn't want to get involved, but Lee Ann "proceeded to tell [her] that she had taken care of the [Sims] kids eighty percent of the time and that she was the caregiver for [Granny.]" Duke knew both statements to be false and said so. She told Lee Ann to leave. Lee Ann persisted. Duke continued to ask Lee Ann to leave, then threatened to have her removed. Lee Ann persisted. Finally, Duke told her, "Please leave my property and don't come back." And Lee Ann responded that "I did not know what I was getting myself into. I didn't not know what I was getting involved in." Duke testified that "of course" she took that as a threat.

The record suggests that Lee Ann hoped to obtain custody or formal visitation rights, either as a grandparent or someone who had stood in loco parentis—which, so far as the record shows, she had not yet done. Her counsel argued that "[s]aying you'll take somebody's kids away," as she had threatened to do, was a "threat of a legal nature . . . not a threat of violence." When the court announced it would grant orders of protection,

5

counsel objected that with the orders in place, "how do I do in loco parentis, how do I do anything to that effect?"

Meanwhile, Lee Ann had been asking around about Mathew. Steve Warren testified that he, Mathew, and Mathew's brother were at work when Lee Ann called the brother. While he had her on speakerphone, she asked to talk to Mathew's boss, a Mr. Pasmore, and asked him if Mathew "was ever aggressive or left or threatened anybody at the job site or him and . . . Mr. Pasmore got in a fight or anything like that." Mathew testified that another boss had sent him screenshots of text messages from Lee Ann. As a result of what she said, Mathew said he "filed me off." Warren testified that Lee Ann had come to Warren's house after the incident in May 2023, and he told her to slow down and think about what she was doing. He said, "[Y]ou're going to lose your grandkids, and it's gonna hurt the whole family." Her response was, "He can't talk to me like that. I'm going to teach him a lesson." According to Warren, Scarlett had moved in with him in June because "she's been terrified."

Lee Ann and her husband testified. Lee Ann testified, generally, that she hadn't threatened to harm anyone and never would, that she hadn't broken into the Walnut Ridge house, and hadn't been by the house at all on June 28 (when Duke said she saw them), only June 29. Her husband carried the .22 revolver "on his hip," she testified, and it was probably at home or on his person at that very moment.

George's testimony did not directly inculpate Lee Ann but did step all over her account. He testified that he and Lee Ann had gone to Granny's house to change the locks

6

on the 28th. Then he said the 29th. Then the 28th or the 29th, then the 28th again, and finally the 29th again. He said he had not carried the .22 revolver in two years.

The circuit court credited the Simses' testimony about the gun threat in June and explicitly found that Lee Ann lacked credibility. The court noted the Simses' testimony that Lee Ann spanked the children with objects other than her hand. "That's not what [Lee Ann] said[,]" it acknowledged, but "I did not believe her."

In the written order of protection, the circuit court's findings included these:

> Although the Respondent contends that an Order of Protection is not warranted in favor of the minor children the Court disagrees. The Order is not being granted solely because the Respondent spanked the children in the past although she spanked them with belts and other objects multiple times over the objection of the parents and stated that she could do whatever she wanted to do when they were in her care.

> An [order of protection] is warranted because of the totality of the actions of Ms. Hall, including the threats that "I have something that will end you" being made while brandishing a gun toward the minor grandchildren's parents if she were not allowed to see the children. The parents' refusal to allow her to see the children is the basis for the bad behavior of Ms. Hall.

> In addition to the threat made while brandishing a weapon, the Court finds that Ms. Hall set the Sims' clothes and bed on fire, ransacked her own mother's house, sought an Order of Protection against the Sims in another county which was denied after a hearing, attempted to get her son fired from his job and called DHS without just cause. This Court fears that the children also are in imminent danger with their grandmother, Lee Ann Hall, because she has demonstrated the lengths she will go to get revenge when she doesn't "get her way" and the Court fears she might hurt the children or cause deliberate harm to them out of spite for her son and daughter in law.

We review the circuit court's findings after a bench trial for clear error. *Sharbino v. Graham*, 2023 Ark. App. 399, 676 S.W.3d 29. A finding is clearly erroneous, though there may be evidence to support it, if review of all the evidence leaves us with a definite and firm conviction that a mistake has been made. *Smith v. Murphy*, 2017 Ark. App. 188, 517

7

S.W.3d 453. Resolving disputed facts and determining witnesses' credibility is the province of the fact-finder. *Simmons v. Dixon*, 96 Ark. App. 260, 240 S.W.3d 608 (2006).

Lee Ann argues on appeal that the order of protection for the minor grandchildren could not rest, as a matter of law, either on Lee Ann's acts of abuse against Scarlett and Mathew or on spanking the grandchildren, as corporal punishment without proof of physical injury has not been recognized as domestic abuse. She argues the finding she committed domestic abuse against Scarlett is factually unsupported.

The challenge to the abuse finding against Scarlett, which rests mostly on asserted discrepancies in testimony about whether the gun threat occurred on June 28 or June 29, would be unpersuasive under any standard. Duke testified she saw the Halls outside Granny's house as she was on her way to evening church. She goes to church Wednesdays and Sundays. June 28 was a Wednesday. Crediting her testimony and the Simses' instead of Lee Ann's, the timeline fits. We have affirmed domestic-abuse findings based on a variety of conduct short of actual physical harm. *Smith*, *supra*. And we now affirm the finding of domestic abuse against Scarlett.

We affirm as to the grandchildren, too. Lee Ann argues that under *Kankey v. Quimby*, 2020 Ark. App. 471, 611 S.W.3d 671, the circuit court erred by entering an order of protection for the children based on acts of domestic abuse against Scarlett and Mathew. We are not persuaded. In *Kankey*, we reversed an order of protection for the petitioner's child where "[t]he most that [the petitioner] claim[ed]" was that the appellant's abusive conduct toward her "occurred in the presence of [the child]." *Id.* at 10, 611 S.W.3d at 676. We noted that the petitioner had not alleged abuse of the child at any point, and had even

8

testified that "even though [appellant] was very abusive" to her, "he was a wonderful father." *Id.* at 9, 611 S.W.3d at 675.

Here, Scarlett petitioned for an order of protection on behalf of the children and herself, stating in her petition that Lee Ann spanked the children with a belt after Scarlett told her never to hit them, and that the boys "tell me she whips them hard until they cry." In *Sharbino*, *supra*, and *Smith*, *supra*, we affirmed orders of protection against a parent based on domestic abuse of a child the parent contended was reasonable and moderate corporal punishment. Though we noted evidence in both cases that the discipline caused physical injury, the cases are distinguished by the fact that the person administering discipline in both was a parent. Crediting Scarlett as the circuit court did, Lee Ann spanked the children with objects other than her hand and insisted on a right to do so over their parent's objection. Further, the circuit court was not required to assess Lee Ann's conduct toward the grandchildren in isolation from her conduct toward the Simses. *Dixon v. Dixon*, 2022 Ark. App. 439, 655 S.W.3d 520; *Baltz v. Baltz*, 2021 Ark. App. 202, 624 S.W.3d 338.

Affirmed.

TUCKER and THYER, JJ., agree.

*R. Scott Trout*, for appellant.

*Legal Aid of Arkansas, Inc.*, by: *Lindsey Schmeidler*, for appellee.