## Mark SIMMONS *v.* Angie DIXON

CA 05-1398 240 S.W.3d 608

### Court of Appeals of Arkansas
### Opinion delivered October 4, 2006

[Rehearing denied November 1, 2006.\*]

*Hoskins & Harris, P.A.*, by: *James W. Harris*, for appellant.

*Legal Aid of Arkansas, Inc.*, by: *Andrea Walker*, for appellee.

S AM BIRD, Judge. Appellant Mark Simmons appeals the trial court's entry of a protective order against him after his ex-girlfriend, appellee Angie Dixon, filed a petition for the order based on allegations that Simmons had threatened her and her dog. On appeal, Simmons contends that the trial court's decision was both an error of law and was unsupported by the evidence. We affirm.

---

\* ROAF, J., would grant rehearing.

On September 20, 2005, Dixon filed a "Petition for Order of Protection" on behalf of herself and "an adjudicated incompetent person whose name is Dog Mojo," alleging that Simmons had committed domestic abuse by sending text messages in which he threatened to harm her and to kill her dog. The petition also alleged that Simmons had been "cussing" Dixon and "beating on [her] car" during an incident at Sonic. Furthermore, the petition alleged that Simmons called Dixon's place of employment and made derogatory comments about Dixon.

At a hearing held on September 30, 2005, Dixon testified that she was Simmons's girlfriend for eighteen months and that she lived with him for fifteen of those months. She claimed that, during this time, Simmons became physically abusive when he drank. She said that "when he got drunk a jealousy streak would come out" and that he would "push [her] or pull [her] out of places."

Dixon further testified that she filed for the order of protection after an incident at Big Daddy's nightclub in June 2005, claiming that Simmons walked in while she was dancing and called her a "whore." She said that he pushed her while she was on the dance floor.

Dixon also described a series of text messages that she received from Simmons. She claimed that she received the messages during the period from April 22, 2005, to May 22, 2005. According to Dixon, in these messages, Simmons called her a "lying whore" and threatened to kill her dog.

Dixon explained that the reason she waited until September 2005 to file the petition for a protective order was because she was waiting for a court date, and the Mississippi County Sheriff's Department had never received a faxed copy of the police report that she made "in April and in May." She claimed that, since the "incidents back in May,"[1] the only other incidents with Simmons were "catty remarks" and "the flipping of the finger." She said that if she was walking to someone's house, he would scream out obscenities and "flip [her] off." She agreed that this was "not really a clear and present danger of bodily harm" and said that she "just want[ed] him to leave [her] alone, keep his comments to [himself,] and keep his finger to [himself]." She said that the last time the two went out together on a date was March 18, 2005.

---

[1] We are uncertain as to which incidents Dixon is describing here. In any event, Dixon's testimony was that she received text messages from Simmons during the period from April 22, 2005, to May 22, 2005, and that an incident at Big Daddy's nightclub occurred in June 2005.

Dixon denied stating that Simmons "beat on her car." She claimed that officers asked her if he touched her car, and she said that he "shook it." She said that she was "confused." She said that she went to the police after the incident at Big Daddy's and was "afraid" because Simmons said in his text messages that "if he caught me out . . . he [would] whip me and . . . I would find my dog dead in my backyard."

Simmons also testified at the hearing. He claimed that he had a relationship with Dixon from October 2003 to March 2005 and that they lived together for "roughly five to six months" during the time that they were dating. He said that the last time he spoke to Dixon was in June 2005 when she walked up to him at the Holiday Inn (where Big Daddy's nightclub was located) and "started cussing [him]." He said that she then went to the dance floor and told some friends "some stuff that wasn't true." He said that he went to "confront" her on the dance floor and that she pushed him. When she did, he "went to slap her hands down" and her current boyfriend "jumped in the middle of it." Simmons stated that the bouncers at the club asked Dixon and her boyfriend to leave, and that he had not had any contact with Dixon since. He denied any physical abuse during his relationship with Dixon and specifically said that he "never touched her." He claimed that he had never hit a woman. He explained that he slapped Dixon's hands down at Big Daddy's to keep her from hitting him. He said that he contacted her place of employment in September 2005 to inquire about whether she had a restraining order against him.

Simmons admitted to sending text messages when he and Dixon first broke up because "she was telling people that she was going to make [him] lose [his] job and that [he] beat her and everything." Simmons also admitted that he threatened to kill Dixon's dog, but never did so. He explained that he bought the dog for her and would never hurt the dog. He said he told Dixon that if she kept telling people that he beat her, he would. He opined that she knew that he did not mean what he was saying in the text messages because he "never followed through with it" and it was "four or five months later before she worried about it."

Following the hearing, the court stated as follows:

> All right. Thank you. I have a sheet that I follow, and it's taken directly from the Arkansas code as to the requirements for the issuance of an Order of Protection. And basically everything has been met except the one point of contention as to whether or not

there has either been physical harm, bodily injury, assault, so forth. And one of those requirements is the infliction of fear of imminent physical bodily harm or assault.

The Defendant admitted that he made a text message to her saying, if you don't quit telling people this, I am going to beat your — da da da. And that was clearly intended to scare her into quit [sic] bad-mouthing him. And that is the element that's required for the issuance of an Order of Protection. It's the infliction of fear of physical assault.

So the Order of Protection is issued. It will expire December the 31st of 2006. The request for payment of attorney fees is denied.

Simmons presents two arguments on appeal. First he claims that "under any reasonable interpretation of the legislative enactments relating to protective orders the allegations made by Ms. Dixon do not give rise to a valid cause of action against Mr. Simmons." Second, he asserts that "even if Ms. Dixon's allegations set forth in her petition could be remotely considered sufficient to come within the applicable statutes the evidence that was presented was simply not sufficient to meet her burden of proof."

*Whether Simmons's Actions Fell Within Statutory Parameters*

Simmons first argues that we should reverse the trial court's decision because his actions did not fall "completely within the words" of the statutes relating to protective orders. Orders of protection are governed by The Domestic Abuse Act of 1991, codified as Ark. Code Ann. § 9-15-101 – 9-15-303 (Repl. 2002 and Supp. 2005) (collectively, the Act). The purpose of the Act is "to provide an adequate mechanism whereby the State of Arkansas can protect the general health, welfare, and safety of its citizens by intervening when abuse of a member of a household by another member of a household occurs or is threatened to occur, thus preventing further violence." Ark. Code Ann. § 9-15-101 (Repl. 2002). The Act defines domestic abuse as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members[.]" Ark. Code Ann. § 9-15-103(a)(1) (Repl. 2002). Under the Act, a petition for relief "shall allege the existence of domestic abuse and shall be accompanied by an affidavit made under oath stating the

specific facts and circumstances of the domestic abuse and the specific relief sought." Ark. Code Ann. § 9-15-201(e) (Repl. 2002). A circuit court may provide the following types of relief in response to such a petition:

(1) Exclude the abusing party from the dwelling which the parties share or from the residence of the petitioner or victim;

(2) Exclude the abusing party from the place of business or employment, school, or other location of the petitioner or victim;

. . .

(6) Prohibit the abusing party directly or through an agent from contacting the petitioner or victim except under specific conditions named in the order; and

(7)(A) Order such other relief as the court deems necessary or appropriate for the protection of a family or household member.

(B) The relief may include, but not be limited to, enjoining and restraining the abusing party from doing, attempting to do, or threatening to do any act injuring, mistreating, molesting, or harassing the petitioner. . . .

Ark. Code Ann. § 9-15-205(a) (Repl. 2002).

Simmons points out that, in the petition for the order of protection, Dixon requested that Simmons be excluded from an apartment that neither of them occupied and that Simmons be excluded from a bar in Blytheville, and Dixon also asked the court to protect her dog Mojo. Simmons claims that "none of those requests fit within any of the types of relief authorized by A.C.A. 9-15-205." We note that this argument was not raised below and that Simmons is therefore precluded from raising it on appeal. *See Jordan v. Diamond Equip. & Supply Co.*, 362 Ark. 142, 207 S.W.3d 525 (2005). Even were we to address this argument, we would also note that the trial court did not grant the requested relief except to the extent that Simmons was "excluded from the residence occupied by Petitioner [Dixon] either at the address shown in the petition . . . or at any other residence in which the petitioner children [sic] may be present." This relief was clearly permitted under the statute, regardless of whether Dixon's petition indicated an incorrect address. We therefore fail to see how Simmons was

prejudiced by Dixon's requests for relief; as a result, we could not reverse on this point. *See Pablo v. Crowder*, 95 Ark. App. 268, 236 S.W.3d 559 (2006) (recognizing that this court will not reverse in the absence of a demonstration of prejudice).

Simmons further asserts that there was no evidence that Dixon suffered bodily injury at the hands of Simmons and that Dixon's "only fear of 'imminent' harm related to [Simmons's] name-calling and [Simmons's] alleged threats to the dog he bought her while they were intimately involved." Simmons claims that the legislature did not intend the protective order scheme to apply to family pets, and that, based on her own testimony, Dixon was never afraid for her personal safety; rather, she only wanted Simmons to quit calling her names. Furthermore, Simmons claims that, because Dixon waited four months to file the petition, she was not in fear of "imminent" harm. For these reasons, he argues that Dixon's allegations "do not come squarely within what the statute prohibits or purports to guard against." We disagree.

Here, it is clear that the trial court did not grant relief based on Simmons's threats to the dog, but rather his threats to "beat" Dixon herself. Moreover, Dixon's allegations came within the broad parameters of the Act because, although she waited four months to file the petition in this case, she was clearly in fear of "imminent" harm at the time that Simmons threatened her.

In *Mississippi River Transmission Corp. v. Weiss*, 347 Ark. 543, 550, 65 S.W.3d 867, 872–73 (2002), our supreme court stated as follows:

> We review issues of statutory interpretation de novo, as it is for this court to decide what a statute means. In this respect, we are not bound by the trial court's decision; however, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language.
>
> When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. When the meaning is not clear, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other

appropriate means that shed light on the subject. The basic rule of statutory construction is to give effect to the intent of the General Assembly.

(Citations omitted.)

 Arkansas Code Annotated section 9-15-103 includes "the infliction of fear of imminent physical harm" as a form of domestic abuse. In this case, the evidence shows that Dixon was in fear of "imminent" harm as contemplated by the broad purpose of the Act — to prevent domestic violence. According to Webster's Dictionary, "imminent" means "likely to occur at any moment" or "impending." *See Random House Webster's College Dictionary* 673 (1996). Here, Dixon claimed that she was "afraid" when Simmons sent the threatening text messages. This clearly fell within the broad parameters of the statute — "imminent" meaning "likely to occur at any moment" or "impending" at the time of the alleged abuse, not at the time of filing the petition for a protective order. Given the purpose of the statute, to prevent domestic abuse, we cannot see how the statute could be interpreted any other way. In addition, as Dixon points out, the Act itself prohibits the denial of an order of protection based solely on the amount of time between the alleged abuse and the filing of the petition. *See* Ark. Code Ann. § 9-15-214 (Repl. 2002) (stating that a circuit court shall not deny a petitioner relief "solely because the act of domestic or family violence and the filing of the petition did not occur within one hundred twenty (120) days"). The fact that Dixon waited four months to file the order is not a basis for reversal. Thus, the trial court did not err in its interpretation of the statute.

*Sufficiency of the Evidence to Support the Trial Court's Decision to Issue the Order of Protection*

Regarding Simmons's claim that the evidence is insufficient to support the trial court's decision in this case, his arguments are apparently the same as for the first point addressed above. Essentially, Simmons is arguing that his actions did not meet the statutory requirements for the issuance of a protective order and, thus, that there was insufficient evidence for the court to issue such an order. In bench trials, the standard of review on appeal is not whether there is substantial evidence to support the finding of the court, but whether the judge's findings were clearly erroneous or clearly against the preponderance of the evidence; a finding is

clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Chavers v. Epsco*, 352 Ark. 65, 98 S.W.3d 421 (2003). Disputed facts and determinations of credibility are within the province of the fact-finder. *Id.*

■ Here, we are not left with a firm conviction that a mistake was made. Simmons admitted to sending threatening text messages to Dixon, and Dixon claimed she was "afraid" after receiving the messages. As discussed herein, this was clearly sufficient to show the infliction of fear of "imminent" physical harm under the domestic abuse statutes. We therefore affirm.

Affirmed.

PITTMAN, C.J., and GLADWIN, GLOVER, and BAKER, JJ., agree.

ROAF, J., dissents.

ANDREE LAYTON ROAF, Judge, dissenting. I would reverse and dismiss this case because I do not believe that appellee Angie Dixon presented sufficient evidence to justify the grant of a protective order. I conclude that the trial court erred in finding that there was the infliction of fear and imminent physical harm, bodily injury, or assault, an element of the statutory offense, under the circumstances of this case.

At the September 20, 2005, hearing, Dixon testified that she and Simmons had separated on April 1, 2005, and that she began receiving text messages on April 22. She claimed that Simmons called her a lying whore and stated that she needed to quit telling people that he whipped her "a**" or he would actually do it. She claimed that she never said such a thing, but merely told people that he had a habit of pushing when he got drunk. Dixon also testified that Simmons threatened to kill the dog he had given her as a Christmas gift because they were in a dispute as to whether she had returned all of his Harley-Davidson items. She stated that she received the last message on May 22, 2005, and that she decided to get an order of protection in June 2005, after Simmons came into Big Daddy's club, called her a whore, and pushed her.

She claimed that she filed a report with the Dell police although the club is in Blytheville, because she was asked to leave the club and she went home and called the police. According to

her, the report never got faxed to the sheriff's department until September 20, 2005, and she waited so long to file the complaint because she was told that she would have to wait for a letter to get a court date. Dixon further testified that she was going to dismiss the complaint as long as Simmons left her alone and stopped making catty remarks and flipping her off. She stated that she believed that Simmons would leave her alone because he was getting married. She also stated that she would be satisfied with a restraining order or a mutual restraining order if the court did not grant an order of protection.

On cross-examination, Dixon stated that after the sheriff's department received the police report, she told them that the only thing Simmons was doing now was making catty remarks and flipping her off, which she admitted did not present a clear and present danger of bodily harm. She testified that she worked at Fasco and Drift-In and that Simmons had never been to either place to her knowledge, although she believed that either Simmons or his fiancee had called her supervisor at Drift-In. Dixon also admitted that she asked that Simmons be restrained from the residence where neither of them still lived and admitted that when she went to work at Drift-In, she told her supervisor, Wayne Snow, that she had a restraining order against Simmons.

Dixon testified that "[A]t the time I went to the Dell Police Department it was because of the incident at Big Daddy's. I had all the text messages, therefore, they wanted those." However, she testified that she was afraid because Simmons said in the text messages that if he caught her out he would whip her and that she would find her dog dead in her backyard.

Simmons's testimony agreed with much of Dixon's, and he likewise confirmed the incident at Big Daddy's in June 2005, where there was a confrontation which resulted in Dixon and her male companion being ousted by the club's bouncers.

In Dixon's affidavit that she filed on September 20, 2005, seeking the order of protection, Dixon recited the text messages and an incident at a Sonic restaurant that occurred August 5, made no mention of the incident at Big Daddy's that precipitated her police report, yet asked that the court exclude Simmons from an apartment where they no longer lived, her place of employment, and also "Big Daddy's."

The purpose of the domestic abuse law is to "provide an adequate mechanism whereby the State of Arkansas can protect the general health, welfare, and safety of its citizens by intervening

when abuse of a family member of a household by another member of a household occurs or is threatened to occur, thus preventing further violence." Ark. Code Ann. § 9-15-101 (Repl. 2002).

In this instance, testimony reveals that Dixon filed her petition after the altercation in Big Daddy's club, after which she admitted that she was the one asked to leave. In addition, she did not dispute Simmons's testimony that she was the one who initially approached him in the club and had to be restrained by her boyfriend. The club incident occurred well after Dixon testified that she received her last text message, and her actions negate the prospect that she feared Simmons would cause her bodily harm. Further, Dixon admitted that Simmons no longer bothered her except to make "catty remarks," and that these remarks did not cause her any imminent fear, but that she just wanted them to stop.

It appears that both Dixon and Simmons said and did unkind things to each other, and Dixon was often the aggressor. The trial court recognized this when it stated that Simmons's threat to whip Dixon was clearly intended to scare Dixon to stop "badmouthing" Simmons; however, the trial court made no finding as to whether Simmons's text message actually inflicted Dixon with fear of *imminent* harm. Dixon asserts that the trial court did make a finding of imminence when it stated that this finding was required for the issuance of an order of protection. This assertion is incorrect. As stated previously, the court only found that Simmons *intended* to scare Dixon, not that he actually inflicted her with imminent fear. Even if the assertion were correct, such a finding of imminence would be clear error. Witness credibility did not seem to be an issue in this case, as the trial court decided to issue an order of protection based upon Simmons's own testimony.

The trial court clearly erred in issuing an order of protection against Simmons because it did not make a finding of infliction of fear of imminent bodily harm. In the absence of that finding, the court could have (but did not) made a finding that Simmons had actually caused Dixon bodily harm. While Simmons admitted to sending some ill-advised text messages, I have a definite and firm feeling that a mistake has been made in this case. Not only was there no fear of imminent infliction of physical injury, but the court issued an order of protection requiring Simmons to stay away from a night club and from a residence at which neither party resided. While protection-order hearings are not criminal in nature, there is some stigma attached to having been found to be the perpetrator in a domestic-abuse case. The trial court at most

should have issued mutual restraining orders because both parties agreed that they wanted the other to leave them alone; however, it was error to grant an order of protection against Simmons simply because Dixon wanted him to stop making catty remarks, especially in light of the fact that Dixon appeared to be also making derogatory statements about Simmons.

While Dixon did claim after the fact that she was afraid, it is abundantly clear from her testimony and the other evidence presented that she was angered by the incident at Big Daddy's, sought to make a police report only as a result of that incident, and that it was the police who then injected the text messages into this dispute. I do not think the important statutory protection afforded by Ark. Code Ann. § 9-15-101 for persons who experience real and threatened domestic abuse is advanced by permitting its utilization to allow a party, such as Ms. Dixon, in a back-and-forth boyfriend-girlfriend feud to score one-upmanship points.