Cite as 2020 Ark. App. 437

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-19-785

|  |  |
|---|---|
| TYRICE BROWN  APPELLANT  V.  VICTORIA MCCAULEY  APPELLEE | **Opinion Delivered:** September 23, 2020  APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23DR-19-46]  HONORABLE H.G. FOSTER, JUDGE  AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Tyrice Brown appeals a final order of protection entered by the Faulkner County Circuit Court prohibiting him for contacting appellee Victoria McCauley until March 7, 2029. He argues that the evidence was insufficient to support the ten-year protection order. We affirm.

Appellee filed a petition for an ex parte temporary order of protection on behalf of herself on January 15, 2019. In the petition, appellee alleged that on August 28, 2018,

> Tyrice rolled on top of me and inserted his penis into me while I was trying to push him off and telling him no and to stop. He also finished inside of me against my will.

> I am scared that now that I am doing something about what he did he may try to find me and we go to the same University.

In the accompanying affidavit, appellee also stated that she "asked if he at least had a condom. He lied and said no." She further stated that appellant stopped in the middle of sex and told her that he did have a condom, he "just didn't want to use it." A temporary order of protection was entered the same day, effective until February 7. The order was extended for fifteen days on February 7. It was extended for fourteen more days on February 21.

The court held a hearing on the petition on March 7. Appellee testified that she had been in an on and off dating relationship with appellant for a couple of years. She stated that on the date in question, appellant came to her residence unannounced and walked into the residence without knocking. She said that she was naked at the time and the two just engaged in conversation. Appellant informed her that he had to go help his mom but that he would be back later so they could have sex. Appellee testified that she did not really think that appellant was going to return. She said that appellant returned around 11:00 p.m. Appellee testified in pertinent part:

> When he came back he did not knock, he walked in, but I heard him walking in this time. I was on my bed. He laid down on my bed, I wrapped up in a blanket, and we talked for a while. We just talked about his mom; I think his brother was brought up. And then at the end of that conversation, there was, like, no build-up or anything, he just rolled over on top of me. At that time, there had been no been any indication that that was going to happen. There was no build-up to it. He doesn't kiss, so there was no kissing.

> I asked him if he had a condom, and he said no. I basically told him, if he doesn't have a condom, then we don't need to have sex. After that he had his arms on the side of me and he started moving up. And he moved his penis to where he could put it inside of me. I had my hands on his shoulders and pushing, like, down to, like, kind of moving me away.

2

Obviously, he's much stronger than me, so it didn't do much. But he stuck his penis inside of me and said, "Oh, there it is." And I froze and I stopped. I was on my back. He did what he needed to do.

In the middle of it, he stopped and said, "I do have a condom; I just didn't want to use it." He finished inside of me without telling me, without my knowledge. He didn't have a condom on. He said that he didn't have one.

I said, "Did you not finish?" He said, "If I said no, I would be lying." And so he got off me.

I went to the bathroom. I freaked out because he didn't know this at the time, but I had just got my birth control. It wasn't working. Since he finished inside of me it was a possibility that, like, I could be pregnant. So I went to the bathroom, freaked out, came back, explained that to him. He asked me why I was acting the way I was acting, and basically implied that this had happened before. To my knowledge, this had never happened before. I just was just explaining to him, like, no, like, this is serious. You don't understand. Like, you finishing inside of me means that, like, I could be pregnant with your kid right now.

She stated that they subsequently rode around until they found a Plan B that she could take. She said that appellant came back to the residence with her and did not leave until he was sure that she had taken the pill. She testified that other than running into appellant at Einstein's, she has not had any contact with him. At Einstein's, appellant tried to touch her with his foot and told her he did not understand why she had blocked him on everything. She stated that she told him that it was okay, and she walked away after she received her drink. She said that she saw appellant again at Cadron, but he just smiled and kept walking. Appellee testified that she received counseling at UCA and that eleven days after the sexual contact, she went to an urgent-care facility for a full screening. She was adamant that she did not indicate to appellant that she wished to have sex and insisted that she "explicitly told him that [she] did not want to have sex with him."

3

On cross, appellee stated that she has told her family, friends, bosses, and a counselor about what happened to her. She also said that she filed a police report. She stated that she initially told a friend about what took place, and the friend suggested that she block appellant on social media. The friend subsequently told her to "say something about it" because it "wasn't right." She said that she filed a police report in November or December but that to her knowledge, no criminal charges had been filed against appellant. She admitted that appellant has come into her residence before without knocking and that they had unprotected sex on prior occasions. She said that appellant did not remove his clothing before lying in the bed with her. She stated that they talked for a while before he got on top of her, pulled his pants down, and put his penis inside her. She said that when she told him about her birth-control situation, he told her to get dressed so they could go to the store. Appellee testified that she blocked appellant's phone numbers and social media. She said that they had only had the one contact in Einstein's, and she was unsure if appellant had tried to come to her residence because she had moved twice since August 28. She stated that she and appellant no longer share mutual friends. She admitted that appellant has not made any contact with her since Einstein's. She stated that her relationship with appellant was routinely off and on and that it was frustrating. She said that over the two years, she would have liked for their relationship to have developed into something more. Appellee stated that prior to August 2018, appellant had never threatened or physically abused her. However, she said that she sought an order of protection because she is afraid of what appellant might do now that she is "vocalizing this."

4

On redirect, appellee stated that she was not jealous, and she was never upset enough to do something to get back at appellant. She said that on the date in question, she and appellant were not in the type of relationship where he could just walk in her door unannounced. She stated that she was afraid of appellant when he approached her at Einstein's. She said that she is afraid that appellant will hurt her again. She further testified,

> I've done everything that I know how to do to keep him from me. I've moved a couple of times. I've blocked communications with him, and I don't go to places that I know he's going to be. He hasn't tried to contact me, but I wouldn't know because I have him blocked on things. I have cut off all communication. We don't have mutual friends anymore, so I wouldn't know if he's tried to. He has a military no-contact order as well. So he has other things in place where he wouldn't be able to talk to me. I'm asking the Court today to put an order of protection in place for the full amount of time that the law allows to continue that protection.

On recross-examination, appellee stated that she is relying on the fact that there are no-contact and protection orders in place as one of the reasons appellant has not contacted her. She said that she is unsure when the military no-contact order went into effect. She stated that she did not take appellant seriously when he told her that would he be back later to have sex and so she did not lock her door. She admitted that she and appellant had sex a week before August 28 in his dorm room.

Appellant unsuccessfully made a motion to dismiss after appellee's case. Appellant testified that he remembered speaking to appellee in Einstein's in September but that he has not tried to contact her since that time. He denied trying to find appellee or having any intentions to find her. He testified that he has been a member of the Air National Guard since April 19, 2017. He stated that he first learned that something was going on when the military served him with a no-contact order regarding appellee. He said that he and appellee were in a sexual relationship for two years and that appellee wanted the relationship to be

5

more serious.  He stated that it was common for them to have unprotected sex since appellee was on birth control.  He testified that he and appellee talked and agreed that they would be having sex that night.  He said that when he arrived, appellee was still naked in the bed. He stated that he took his jacket and things off and got into bed with appellee. He testified that after he told appellee that he did not have a condom, she told him to "just be careful." He denied forcing himself on appellee.  However, he stated that appellee was very upset after they had sex because she was not on birth control.  He said that she insisted that they go and purchase a Plan B, so that is what they did.  He stated that when he tried to find out what was wrong with appellee in Einstein's, she would not engage him.  Appellant stated that prior to August 28, they did not have a history of physical abuse, and he has never threatened appellee.  He insisted that he and appellee had consensual sex on August 28 just as they had the week prior.  He opined that appellee is mad because "it was a wasted relationship."

On cross, appellant stated that there were times when appellee stopped talking to him after they had sex but never to the point where he had to "hunt her down" and try to find out what was going on.  He said that their relationship is "different than it has ever been."  He acknowledged that appellee had never filed charges against him, and they had never had any of the present issues.  He testified that he did not know what the difference was this time, and that is why he approached her in Einstein's.

Appellant renewed his motion to dismiss; however, the court did not rule on it.  The court granted appellee's petition, stating in pertinent part:

> All right, guys.  Normally, as Ms. McKinney is painfully aware, I have a tendency to explain myself in excruciating detail.  And I'd really like to do that here, but I don't

6

think it's going to serve anybody's purposes. If anybody has any questions about why I'm doing what I'm doing, you can ask. I f you need something on the record, I'll put it on the record. But I'm just going to tell you what I'm going to do and I'm going to give you the short form. And here's what it is: the testimony on both sides — the testimony is obviously contradictory. And what it comes down to is credibility and who I believe. And I'm not saying anything beyond what it is I'm fixing to do. In other words, I'm not being critical of anybody. I' m not saying that I think anybody is any better or worse or the[ir] value as a human being is affected in any way by what I'm fixing to do. The only affect on you guys is what I'm fixing to do as far as my comments and what I'm fixing to say. Based on the credibility of the witnesses, my opportunity to observe them, I'm going to tell you, guys, I believe the petitioner. And because I believe the petitioner, I'm granting the order of protection.

The court entered a final order of protection on March 11, 2019, effective until March 7, 2029. Appellant filed a timely notice of appeal on April 8. This appeal followed.

Appellant argues on appeal that the evidence was insufficient to support the ten-year protection order. More specifically, he contends that the court erred because (1) he never threatened appellee; (2) the incident did not constitute a crime; (3) appellee's testimony was insufficient to establish physical harm, bodily injury, or assault; and (4) appellee was angry that the relationship did not become something more. Our standard of review following a bench trial is whether the circuit court's findings are clearly erroneous or clearly against the preponderance of the evidence.[1] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[2] Disputed facts and determinations of credibility of witnesses are both within the province of the fact-finder.[3]

---

[1]*Claver v. Wilbur*, 102 Ark. App. 53, 56, 280 S.W.3d 570, 571 (2008).

[2]*Id.*

[3]*Id.*

7

When a petition for a protective order is filed under the Domestic Abuse Act, the circuit court may provide relief to the petitioner upon a finding of domestic abuse.[4] Domestic abuse is defined as (1) physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members; or as (2) any sexual conduct between family or household members that constitutes a crime under the laws of this state.[5] Family or household members includes persons who have previously been in a dating relationship together.[6]

Although broken into four subpoints, appellant's argument challenges the sufficiency of the evidence to support the final order of protection. Appellee testified that appellant came to her residence unannounced twice on August 28, 2018. She stated that she explicitly told appellant that she did not want to have sex but that appellant forced himself on her and had sex with her anyway. Appellant vehemently denied having anything but consensual sex with appellee on the night in question; however, it was the court's duty to decide who to believe. In this case, the court believed appellee, whose testimony establishes that appellant committed a criminal sexual act against her the night of August 28. The court correctly found that domestic abuse had taken place and granted appellee's petition.

Appellant essentially asks this court to credit his testimony over appellee's; however, it is within the sole province of the fact-finder to weigh credibility and resolve disputed

---

[4]Ark. Code Ann. § 9-15-205(a) (Repl. 2015).

[5]Ark. Code Ann. § 9-15-103(4).

[6]Ark. Code Ann. § 9-15-103(5).

facts.[7] To reverse on this basis would require this court to act as a super fact-finder or second-guess the circuit courts credibility determination, which is not our function. We are not left with a firm conviction that a mistake was made, and we affirm.

Affirmed.

ABRAMSON and SWITZER, JJ., agree.

*Quentin E. May, PLC*, by: *Quentin E. May*, for appellant.

*LaCerra, Dickson, Hoover & Rogers, PLLC*, by: *Natalie J. Dickson* and *Lauren White Hoover*, for appellee.

---

[7]*Simmons v. Dixon*, 96 Ark. App. 260, 240 S.W.3d 608 (2006).