Cite as 2026 Ark. App. 110

# ARKANSAS COURT OF APPEALS

## DIVISIONS II & III
No. CV-24-745

| | |
|---|---|
| BRENNON STONE<br><br>APPELLANT<br><br>V.<br><br>ZOE STONE<br><br>APPELLEE | Opinion Delivered February 18, 2026<br><br>APPEAL FROM THE MADISON COUNTY CIRCUIT COURT<br>[NO. 44DR-24-114]<br><br>HONORABLE JOANNA TAYLOR, JUDGE<br><br>AFFIRMED |

**MIKE MURPHY, Judge**

Appellant Brennon Stone appeals the final order of protection granted against him and in favor of appellee Zoe Stone. In this one-brief appeal, he argues that the evidence was not sufficient to support issuing the order. We affirm.

On June 21, 2024, Zoe filed a petition for order of protection alleging that, on June 20, 2024, when she picked up her daughter whom she shares with Brennon from Brennon's house, he grabbed her, yelled at her, and made her fear for her safety and her daughter's safety.

At the hearing on the petition, Zoe was the first to testify. She testified that, on June 20, Brennon asked her to come pick up their daughter at 5:00 a.m. When she arrived, Brennon demanded that she walk in a straight line to prove she was not under the influence of anything. Zoe testified that Brennon was calling her "an awful mother," shoving her,

swearing at her, and insulting her. She recorded some of the interaction on her phone. The recording's visual content was inconsistent, but the audio of the exchange was captured and transcribed for the record. At one point Brennon told Zoe, "I've been praying on your downfall. Every second of the day. The best day of my life is when you're in a fucking grave. It's when you're fucking dead. Cuz that's the way you treated me for months." On one occasion you can hear Zoe say, "Don't fucking put your hands on me," and later, "Get the fuck out of my way." Other statements made by Brennon included, "The only way you're able to keep a boyfriend is through sex," and rhetorically asking his infant daughter, "Is that your mother, or is that just a slut in your eyes?"

Zoe testified that she wanted to leave, but Brennon was blocking her from leaving and holding their daughter. She testified about why she was unable to leave: "I was unable to get my daughter. He wasn't allowing me to, and anytime I did try to leave with my daughter he would block me physically." After Zoe stopped recording, she called her boyfriend, Jeremy. Jeremy called the police.

Brennon's parents were also at the house. Zoe said that she was finally able to leave by making a bottle for their daughter, and then Brennon's dad told Brennon to let her have the baby. Zoe put the baby in the car seat and walked to her car. Brennon followed her out and opened and slammed her car door multiple times.

When asked about other incidents, Zoe said that Brennon shoves her when they have disagreements: "It wasn't anything huge. Just disagreements. It probably happened once or twice every month."

Zoe testified that she was concerned for the baby's safety because of the way Brennon talks about her. She also testified that Brennon is "not afraid to put his hands on you. He's not afraid to get angry or intimidate you. I don't want my daughter around that." She agreed that she was "terrified," and while the recording showed things like her laughing on a few occasions and asking for her vape, she explained that she does things like that to "try to show him that he cannot intimidate me."

James Stone, Brennon's father, and Kristy Moore, James's wife, testified. They were both at the house the day of the incident, and both testified that they did not hear any yelling. James testified that he never saw Brennon prevent Zoe from leaving, and he in fact told her to go.

Brennon then testified. He acknowledged that while he did speak to Zoe that way, the part about a grave was "a figure of speech," he never threatened her, and never physically hurt her. He said he did block her from leaving, once, by putting his arm in front of her but that he did that because the baby still needed to be changed and fed.

Jeremy McLauren, Zoe's boyfriend, testified. He said that he was on the phone with Zoe the day of the incident and that Brennon did not sound friendly, he was concerned for Zoe and the baby, and he called the police.

From the bench the court stated:[1]

---

[1]For readability, the transcript quotations have been lightly edited to add commas and quotation marks, without brackets, where the court recites or summarizes dialogue from its notes. Party names as they are used in this opinion are also inserted without brackets.

THE COURT:   Okay. I've listened to all the testimony today, and I must say I, I find the whole incident that took place on June 20th of 2024 to be odd. And, the whole incident was instigated by the defendant, Brennon Stone. He is the one who contacted Zoe around 5:00 in the morning and said, "do you want to get [the baby] early," and she said, "sure, I'll come right now." I find that very strange.

There was no testimony today about the time the exchange was supposed to take place, except that it was supposed to take place later in the day, which is typically when exchanges take place. Not at five o'clock in the morning. Mr. James Stone testified he thought it was odd that Zoe showed up at 5:00 in the morning, but he figured either [the baby] was sick, or Zoe was needed at the house, or there was something else that was going on.

But when Zoe arrives, Brennon doesn't just say, "I've got something going on today, and I thought you might have to go to work early," or "I thought this would be the easiest time to do the exchange today," or "the most convenient time to do the exchange." He basically holds Zoe hostage in the bedroom and interrogates her, and makes accusations toward her, instead of handing her [the baby], and, or walking them to the car to put [the baby] in her mother's care. . . . And, I just find that very disturbing. I realize it's 5:00 in the morning, but these parties are in a room, in the home, with [the baby] there. The only other person in the home who is awake is Mr. James Stone, and he's out in the garage, and in the recording Mr. Brennon Stone is whispering.

He says to, in Petitioner's Exhibit B, 1B, which is the transcript of the video, which the Court finds to be substantially accurate, the very first line is, Brennon says, "your so-called mother is here." And, then he says, "I've got to make sure you're mentally prepared to take [the baby]." Then he says, "how long have you been up." And, he says, "why are you crying." And, then he answers his own question. "You know why, because I've been praying for your downfall every second of the day. The best day of my life will be when you're in a fucking grave. When you're

4

fucking dead, because that's the way you treated me for months."

The verbal attack continues. "And now when your life starts to go bad, you don't deserve her. I promise you. You don't. You don't know who you are. You don't respect anything and you're worried about relationships."

And, Zoe says, "would you just get her ready." I mean, honestly, Brennon has called Zoe to the house at 5:00 in the morning, or agreed for her to come at 5:00 in the morning to take custody of [the baby] before the appointed time, and then he basically holds her hostage, and says he wishes she were dead.

[The Court, to Brennon, directly] Brennon, that is inappropriate behavior. And, it might not rise to the level of domestic abuse, but it's sick.

[Continuing findings] And, Brennon goes on to say, "I would be gone a long time ago in the military if I trusted that you were capable of taking care of my daughter. I would have been left."

I'm very concerned about these statements. I'm very concerned about this entire interaction. Brennon, the defendant, has tried to paint Zoe as conniving, and planning, and collecting data, and the evidence for a custody change, but [to Brennon, directly,] Mr. Stone, you did this all by yourself. You started this, and then when you had her in your room, you were whispering these threats to her.

I agree you did not put your hands on her in a way that caused physical harm during this interaction. But, when you say to someone, "I've been praying for your downfall every second of the day, the best day of my life will be when you're in a fucking grave, when you're fucking dead," I would have to say that implied in those statements is that you might be willing to facilitate that.

I hear a lot of recordings between people, and there are very few recordings that I hear or see that make the hairs stand up on the back of my neck, but this one did. Those statements are vile.

5

And, they are threatening. And, you said it because you intended it to be a threat.

And, the fact that she said, after you had said these things, to you, "you'll never see [the baby] again. That does it." I must say definitely Zoe shouldn't have said it, but I can't blame her for saying it, because when I heard you say it, that's what I thought. "Wait a minute, you're not going to see [the baby] anymore." That was *my* first thought when I hear you say that on the recording.

And I'm the one who does get to decide. You treated Zoe like she was a bug. Like you had your thumb on her, and you were in control. And, basically, in that scenario, you just dangled [the baby] in front of her, as if to say, "Oh you're here now. You're in my den, and I'm in control, and you don't get to take [the baby] until I tell you you can take her." So, now you have to put up with all of my stuff, and you have to listen to me.

I don't know if your psychological evaluation of Zoe is accurate. I'm sure Zoe does have some things that she needs to deal with. Zoe is, has just turned 19 years old. She has a baby, and she has to deal with you, the "supportive" co-parent. [To Brennon, directly,] You want to laugh? Go ahead.

MR. STONE:          I'm not laughing.

THE COURT:          Go ahead.

MR. STONE:          You heard a smirk come out of me. I don't think so.

THE COURT:          I am granting, based on the testimony today, a final order of protection for Ms. Zoe Stone for a period of one year as requested.

A final order of protection to that effect was entered, and it is from this order that Brennon appealed. On appeal, he argues that there was no evidence of domestic abuse; therefore, an order of protection was unwarranted.

In bench trials, the standard of review on appeal is not whether there is substantial evidence to support the finding of the court, but whether the court's findings were clearly erroneous or clearly against the preponderance of the evidence; a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Simmons v. Dixon*, 96 Ark. App. 260, 266–67, 240 S.W.3d 608, 613 (2006). Disputed facts and determinations of credibility are within the province of the fact-finder. *Id.* If an order of protection is granted without sufficient evidence to support the finding of domestic abuse, the order will be reversed. *Kitchens v. Whisenhunt*, 2025 Ark. App. 471, 725 S.W.3d 38.

"Domestic abuse," as it is used for purposes of issuing an order of protection under Arkansas Code Annotated section 9-15-205 (Repl. 2020), means "physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members." Ark. Code Ann. § 9-15-103 (Supp. 2025). This case does not turn on whether Brennon caused Zoe physical injury; rather, the dispositive issue is whether the circuit court clearly erred in finding that Brennon's conduct inflicted fear of imminent physical harm.

The legislative definition of "domestic abuse," which must be shown to obtain an order of protection, does not include the terms "harassing" and "controlling." *Hocut v. Hocut*, 2022 Ark. App. 452, 655 S.W.3d 527. That said, if the issue amounts to whether the victim was in fear of imminent harm, it is the victim's fear based on the circumstances that the circuit court is to weigh and ascertain. *See generally Oates v. Oates*, 2010 Ark. App. 345, at 9,

377 S.W.3d 394, 398; *Armstrong v. Armstrong*, 2019 Ark. App. 188, at 4, 574 S.W.3d 720, 722 ("[I]t was within the purview of the circuit court to assess the witnesses' credibility, and the circuit court found Hayley's testimony that she was fearful of Todd to be credible.").

Brennon explains on appeal that the record does not support a finding of domestic abuse. He points out that there was no testimony that he harmed Zoe in any way. He also draws our attention to the court's statement that, while his behavior might have been "inappropriate" or "sick," it "might not rise to the level of domestic abuse." In support of his argument, he cites *Paschal v. Paschal*, 2011 Ark. App. 515.

There, Tressa, the petitioner in *Paschal*, alleged that the appellant, David, was abusive toward her and their children during their marriage; his behavior had become more erratic in the week before she filed the petition for order of protection; he called her house late one night, and when she answered the phone, he threatened that she should make her male friend leave "or else"; he sent an email, text message, and voice message within three minutes after she hung up on him; she believed he was spying on her or had someone spying on her; someone left a bottle of cologne called David in front of her house; David's erratic behavior usually ended in violence; and that she was afraid of David since he was jobless and facing jail time. *Id.* at 2. We wrote that "[t]here was no testimony about what David meant by 'or else.' And without evidence that this was in fact some sort of threat of physical or bodily harm *to Tressa*, we must reverse the trial court's full order of protection." *Id.* at 7 (emphasis added).

Unlike in *Paschal*, the record here leaves no ambiguity as to whom Brennon's statements were directed or whether they conveyed a threat of physical harm. Brennon summoned Zoe to his home at 5:00 a.m. and isolated her in a bedroom while holding their child as leverage. He blocked her attempts to leave as he whispered explicit death-oriented statements in a tone that the court said made "the hairs stand up on the back of [its] neck." He shoved her, blocked her path when she attempted to leave with the baby, and slammed her car door multiple times. The circuit court found the statements were intended to be a threat. Zoe agreed that she was "terrified." It is of little consequence that Zoe did not use the actual word "terrified" until cross-examination.

Domestic violence does not only include actual violence; it also encompasses the *fear* of imminent physical harm, bodily injury, or assault. *Hopper v. Hopper*, 2023 Ark. App. 504, at 7, 678 S.W.3d 602, 607. In *Hopper*, we discussed that even veiled threats, including references to a dead kitten that the victim perceived as threatening, would have been sufficient to support a ten-year order of protection. We wrote that "appellee's testimony that she considered the dead-kitten reference in the many messages sent to her by appellant to be veiled threats was sufficient to support the circuit court's order." *Id.*, 678 S.W.3d at 607. In *Simmons*, we said that threats to "beat" someone were sufficient to make her fear imminent harm. 96 Ark. App. at 265, 240 S.W.3d at 612. The focus of the inquiry is on whether there is conduct in the record that supports the victim's fear of imminent physical harm, and the circuit court is charged with weighing the credibility of that testimony to reach its conclusion. *Oates*, 2010 Ark. App. 345, at 8–9, 377 S.W.3d 394, 398.

And so, while the court did say from the bench that Brennon's behavior "might not rise to the level of domestic abuse," the court also entered a final order declaring a finding of domestic abuse under Arkansas Code Annotated section 9-15-103(4)(A). We will not fault the circuit court for what amounted to thinking out loud; an oral order announced from the bench does not become effective until reduced to writing and filed. Ark. Sup. Ct. Admin. Order No. 2; *Ballegeer v. Ballegeer*, 2021 Ark. App. 390.

After review, we are not left with a definite and firm conviction that a mistake was made. There was sufficient evidence that Brennon's statements and conduct caused Zoe to fear imminent physical harm. The circuit court did not err when it entered a one-year order of protection against Brennon.

Affirmed.

KLAPPENBACH, C.J., and WOOD and BROWN, JJ., agree.

VIRDEN and HIXSON,  JJ., dissent.

**BART F. VIRDEN, Judge, dissenting**. Brennon's behavior should not go unpunished; however, it was not within the statutory definition of "domestic abuse" and was therefore not justification for the order of protection issued in this case. The trial court correctly stated that Brennon had displayed inappropriate behavior and that "while it may not have been domestic abuse, it was sick." But neither "inappropriate" behavior nor "sick" behavior qualifies as domestic abuse. The trial court noted that Brennon had not laid his hands on Zoe but issued the order of protection because of his "infliction of fear of imminent physical harm, bodily injury, or assault."

What Brennon said—that the best day of his life would be when Zoe was dead in a grave—was fantasy talk, not a direct threat to her. Brennon did not say that he was going to do anything to Zoe but noted that he will be happy at some point in the future when Zoe has died. This was not a nice thing to say about MC's mother, but it was not domestic abuse sufficient to warrant entry of an order of protection.

Similarly, in *Paschal v. Paschal*, 2011 Ark. App. 515, the ex-wife, Tressa, filed a petition for an order of protection alleging physical abuse and claiming that her ex-husband, David, had called her house late at night and said that she must tell her boyfriend to leave "or else"; that she believed he was spying on her or having someone else spy on her; that someone had left a bottle of cologne called "David" in front of her house; that David's erratic behavior usually ended in violence; and that she was afraid of David because he was jobless and facing jail time. On much of the same evidence presented at a hearing, the trial court issued a final order of protection, which David appealed. We reversed because, while David's constant phone calls and frequent emails were harassing and controlling, they did not meet the definition of domestic abuse. *See also Hocut v. Hocut*, 2022 Ark. App. 452, 655 S.W.3d 527. We further noted that there was no testimony as to what David meant by "or else" and that, in the absence of testimony that "or else" was a threat of physical or bodily harm to Tressa, the evidence was insufficient to support the issuance of an order of protection. I submit that the vague "or else" comment in *Paschal* is a much clearer threat than the appalling statement Brennon made here.

11

Contrary to the majority's opinion, none of the cases cited therein stand for the proposition that the fear of imminent physical harm is judged entirely from the subjective viewpoint of the complaining party. In fact, this court has both reversed an order of protection granted and affirmed an order of protection denied when the complaining party clearly testified that she was afraid of imminent physical harm. It seems to me that fear of imminent harm in an order-of-protection context would be better judged from the objective viewpoint of a reasonable person, while taking some subjective circumstances into consideration. The complaining party should not be able to simply testify that he or she was "afraid," "fearful," or "terrified" to satisfy the domestic-abuse requirement for entry of an order of protection. While I completely understand the adage of "better safe than sorry," that is not the statutory threshold our courts are tasked to evaluate.

HIXSON, J., joins.

*Leslie Copeland Law & Mediation*, by: *Kristen Komander*, for appellant.

One brief only.